## Pardue v. Commonwealth.

(Decided May 29, 1928.)

## Appeal from Fulton Circuit Court.

1. Abduction.—Word "taking" in Ky. Stats., sec. 1158, relating to taking or detaining a woman against her will, implies more than mere "detention;" there cannot be a taking without a detention, but there can be detention without a taking.

2. Abduction.—Evidence held insufficient to sustain conviction for detaining a woman against her will, under Ky. Stats., sec. 1158, which requires that woman be taken or detained unlawfully against her will with intent to have carnal knowledge of her.

HERSCHEL T. SMITH for appellant.

J. W. CAMMACK, Attorney General, and S. H. BROWN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE LOGAN—Reversing.

The appellant, Richard Pardue, was indicted by the Fulton county grand jury, charged with the crime of detaining a woman against her will. He was convicted by a jury and sentenced to the penitentiary for two years. He complains that he was convicted without any evidence on the part of the commonwealth to support the charge. The evidence to support the conviction as given by the witnesses who testified, in so far as it relates to the commission of the crime charged, will be briefly set out.

Lucille King testified:

"I was coming down the street, and I noticed some one coming down in front of me. We were just walking along there going on to work about 6:30. I noticed some one coming down the street. When I got close to them, I looked up as I always do when I meet any one. I saw, then, some one coming down the street, and he had his hands on his hips with his clothes unfastened and exposing his person, and I stepped aside."

The happening told about by this witness took place on Thursday before the commission of the offense for which appellant was indicted the following Monday. This witness probably saw him in the same condition on another occasion when she was on her way to work.

Lucille Puckett testified that she met appellant on the Monday morning before she went before the grand jury that indicted him on the same day; there were three other ladies with her, and they were all on their way to work at the cigar factory about 6:30 in the morning. This witness is the person mentioned in the indictment as having been detained by this negro. We quote the material part of her evidence as follows:-

"Q. What did this negro do or say when you met him. A. He didn't say anything at all.

Q. What did he do? A. Well, he had his clothes undone and was exposed, and when we met him we turned out into the street.

"Q. Did you see him before you got close to him? A. We saw some one coming, and I had met him before in Tennessee. (Objection by defendant.)

"Court: I don't see anything improper about that. (Exception by defendant.)

"I met him in Tennessee, and when I saw this man coming I looked up and I saw the condition he was in, and I stepped into the street.

"Q. Did you scream? A. No, sir.

"Q. Any of the rest of them with you? A. The rest of them were with me.

"Q. Did the rest of the women with you step into the street? A. They certainly did. Every one.

"Q. When you stepped into the street, what did he do or say? A. He walked on.

"Q. Were you on the sidewalk at the time? A. I was.

"Q. Was it a narrow sidewalk? A. Just a reasonable sidewalk. On Carr street.

"Q. You got off the sidewalk into the middle of the street? A. I got off the sidewalk into the middle of the street.

"Q. You say this thing had occurred before? A. Yes, sir.

"Q. I will ask you if you had reported that matter or had any one for you to report that matter to the police officers? A. Well, the first time I saw it I went right on to my work, had no time to go any place else, and there was no one with me to report it. I told Mr. Campbell's wife to have Mr. McGinnis—

"Objection.

"Sustained.

"Q. Did you or not cause that matter to be reported to any police officer? A. Yes.

"Q. Do you know what police officer that was reported to? A. Mr. Dunn.

"Q. What day do you say this occurred? A. Well, the first time I saw him was last Friday morning.

"Q. How many times has this occurred from the same man? A. Twice.

"Q. Twice before this occasion? A. No. I met him Friday, and then I met him Monday.

"Q. Was he in the same condition both times? A. He certainly was."

Gladys Bissell testified as follows:

"Q. Were several of you together? A. There were five of us.

"Q. When you met this man, how was he dressed? A. Well, he had on overalls and a sweater and his hands in his pockets, and his person was exposed.

"Q. Was his clothing unbuttoned? A. Yes, sir.

"Q. What did you girls do when you saw that man in that condition? A. We went out into the street.

"Q. You went out into the street? A. Yes, sir.

"Q. What did he do? A. He walked on down the street.

"Q. You say there were five of you together at that time? A. Yes sir.

"Q. About what time in the morning was it? A. Between 6 and 6:30 somewhere.

"Q. Tell the jury what effect that had upon you with reference to exciting you or scaring you? A. Well it scared me."

Emma Brockwell testified as follows:

"Q. On last Monday morning on your way to work did you meet anybody? A. Yes, sir; I did.

"Q. Was any one with you? A. Yes, sir, there was four other girls with me.

"Q. Who was it you met, if you know? A. Well, it was that man there. (Indicating defendant.)

"Q. This man here? A. Yes, sir.

"Q. Will you tell what his condition was when you saw him? A. Well, he was exposing himself, had his hands in his pockets exposing himself.

"Q. Had himself exposed with his pants unbuttoned? A. Yes, sir; he did.

"Q. What did you do when you saw him in that condition? A. When I saw him in that condition, I just walked off the walk out into the street and across over on the other sidewalk.

"Q. Had you seen him before? A. I met him Saturday morning.

"Q. Was he in that condition then? A. Yes, sir."

Fred Dunn, the police officer, testified as follows:

"They were some three or four hundred feet ahead of me. So as they got about the new Methodist church up on Carr street I saw the bunch of girls all leave the walk and run across the street on the other side. When they did that, I rushed on down there, and when I got there I met this negro on the sidewalk, and I stopped him and searched him and found him when I searched him with his clothing unbuttoned. He had on overalls and a jumper and cap and had on a pair of pants underneath his overalls."

The conduct of the appellant was such as to bring him under the condemnation of the law, but the question confronting the court for determination is whether he was guilty of detaining Lucille Puckett against her will for the purpose of having carnal knowledge of her. It is not testified by any witness that he spoke to her or any of the other ladies who saw him in the condition described by them. None of them said that he even looked at them, and the prosecuting witness did not testify that he made any demonstration towards her or that he noticed her in any way. He did not seek to obstruct her free passage on the sidewalk by placing himself in front of her. She saw him coming in the condition described, and she became frightened and left the sidewalk. The condition in which he was going about the neighborhood, intentionally or unintentionally, was a menace to decency and calculated to disturb the ladies that he met. Their testimony is intelligent, and we are entirely convinced of the exact truth all they state.

The offense with which he is charged is that defined by section 1158, Ky. Stats. The elements of the crime are found in the statute. Before there can be a conviction, the woman must be taken or detained, and the taking or the detention must be unlawful and must be against her will. If it should be established by the evidence that there was a taking or a detention and that it was unlawful and against the will of the woman, yet the case is not made out until it is shown that the taking or the detention was with the intent to have carnal knowledge of the woman. If the other elements are established, little evidence is required to show the purpose of the taking or the detention. It was said in the case of Commonwealth v. Littrell, 4 Ky. Law Rep. 251, that the two elements of the offense were, first, the unlawful detention of the woman against her will, and, second, the intent to have carnal knowledge of her. It has always been held by this court that, in order to constitute a detention, it is not necessary that physical force be used, such as taking hold of the woman. In Jones v. Commonwealth, 121 Ky. 266, 89 S. W. 174, 28 Ky. Law Rep. 213, the court said:

"If she is detained by him for the purpose of having carnal knowledge of her, he is guilty although the detention is slight in point of time and no physical force is actually used."

In that case the woman was riding on a horse, and she was addressed by a man who had got off of his horse by the side of the road. He mounted his horse and rode towards her and reigned his horse into the middle of the road, and she was forced to turn her horse out to one side. He pressed towards her on his horse until she was forced entirely off the road. She spurred her horse forward and he followed her. The court upheld a verdict of conviction in that case, but the brief reference to the facts show that something was done affirmatively by the man which amounted to detention, although very slight.

There is a distinction between the "taking" and the "detaining" of a woman. Taking implies more than a mere detention. There cannot be a taking without a detention, but there may be a detention without a taking. This distinction is will pointed out in the case of McDowell v. Commonwealth, 207 Ky. 680, 269 S. W. 1019.

It has been held that if the woman is put in fear by threats or show of force which compels her to stop or

flee for safety, it will be sufficient to constitute a forceble detention. Copenhaver v. Commonwealth, 104 S. W. 750, 31 Ky. Law Rep. 1161.

The latest case on the subject is Tinsley v. Commonwealth, 222 Ky. 120, 300 S. W. 368. The evidence in that case showed that the prosecuting witness on her way to work saw the defendant on his porch waving to her. His house was on a high embankment, and he ran down the steps and started in her direction. She became alarmed and ran up the road, and when she came to a turn in the road she looked back and saw the defendant by the side of the road about 400 feet from her. She again ran, and upon looking back she saw the defendant was pursuing her and he called to her to wait. The court held in that case that there was not sufficient evidence to show a detention. The cases cited in the Tinsley case will illustrate the facts necessary to constitute a detention. An examination of these authorities will show that in each instance the defendant was guilty of some overt act calculated to detain the woman either by obstructing her free movements, placing her in fear, or by threats of some nature which were calculated to interfere with the exercise of her own free will.

In this case we have nothing to sustain a conviction other than the unseemly conduct of the appellant in going about the streets of the city of Fulton. The evidence was not sufficient to sustain a conviction, and there was no evidence from which the jury could infer that the offense charged in the indictment had been committed. The court should have given a peremptory instruction to find appellant not guilty.

Judgment reversed, and cause remanded for proceedings consistent with this opinion.